UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**JASON J.**

                              **Plaintiff,**

v.                                                       1:20-CV-01298 (NAM)

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**[1]

                              **Defendant.**
_____

**APPEARANCES:**

Mary Ellen Gill
Kenneth R. Hiller
Law Offices of Kenneth Hiller, PLLC
6000 North Bailey Avenue, Suite 1A
Amherst, NY 14226
*Attorney for Plaintiff*

Timothy Sean Bolen
Social Security Administration
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, MA 02203
*Attorney for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

      Plaintiff Jason J. filed this action on October 21, 2020 under 42 U.S.C. § 405(g),

challenging the denial of his applications for Social Security Disability ("SSD") benefits and

---

[1] Plaintiff commenced this action against Andrew M. Saul, the former Commissioner of Social Security. (Dkt. No. 1). Kilolo Kijakazi became the Acting Commissioner on July 9, 2021 and will be substituted as the named defendant in this action. Fed. R. Civ. P. 25(d). The Clerk of Court is respectfully directed to amend the caption.

1

Supplemental Security Income ("SSI") under the Social Security Act.  (Dkt. No. 1).  After carefully reviewing the Administrative Record, ("R," Dkt. No. 13), the Court reverses the decision of the Commissioner and remands for further proceedings.

## II.     BACKGROUND

On June 8, 2017, Plaintiff filed applications for SSD and SSI benefits, alleging that he became disabled on March 13, 2017; Plaintiff claimed that he was disabled due to: 1) carpal tunnel in the right wrist; 2) soft tissue damage in the right arm; 3) pinched nerve caused by C7 disc in neck; 4) bleeding in the brain; and 5) cluster headaches.  (R. 338).  The claims were denied initially on November 2, 2017, (R. 208), and Plaintiff requested a hearing.  (R. 216).  On September 30, 2019, Administrative Law Judge ("ALJ") Andrew Soltes, Jr. held a hearing at which Plaintiff appeared and testified.  (R. 127–68).  On December 4, 2019, ALJ Soltes issued a written decision denying Plaintiff's claims.  (R. 13–33).  The Appeals Council denied review, (R. 1–7), and Plaintiff then commenced this action.  (Dkt. No. 1).

### A.  Plaintiff's Background and Testimony

Plaintiff was 39 years old as of the hearing on September 30, 2019.  (R. 133).  He testified that a car accident in 2017 greatly impacted his health, specifically that he had carpal tunnel syndrome, nerve entrapment in his left arm, and four herniated discs in his back that caused cluster headaches.  (R. 141–42).  He testified that he used to have two headaches per day, but since 2017 he was having about five headaches per day.  (R. 142).  Plaintiff testified he took Sumatriptan for his headaches, which provided relief, but he had trouble getting enough medication because his health insurance only provided nine pills per month whereas he needed all nine pills in about four days.  (R. 142).  Plaintiff testified that he could not afford to pay for the medication out-of-pocket.  (R. 142).

Plaintiff testified that his headaches occurred on the left side of his head and lasted about 30 minutes if he took medication. (R. 152). Without medication, the headaches lasted four to five hours. (R. 152). Triggers for the headaches included light and noise. (R. 152). He used to get injections of Sumatriptan, but his health insurance no longer covered them. (R. 152). When Plaintiff got headaches, his concentration and focus were "terrible," and he avoided all activities. (R. 153). He went to the ER if he did not have Sumatriptan. (R. 153). If he had medication, he would have to go to a quiet place and wait for the medication to kick in. (R. 153).

Plaintiff also testified he could only stand and walk about 30 to 45 minutes at a time due to neck pain. (R. 144–45). He testified that the pain is aggravated by turning his head or leaning his neck, and that the pain travels down to his back and hands. (R. 151). He experienced pain if he leaned his head forward for too long, which he defined as about 20–30 minutes. (R. 151). Plaintiff testified that he had difficulty driving because it hurt his neck. (R. 140). He was able to do some chores but received assistance from his daughter and girlfriend. (R. 147).

### B. Medical Evidence

#### 1. Treatment Records

On March 13, 2017, Plaintiff was in a motor vehicle accident in which his car was hit head-on at an estimated 30 miles per hour; Plaintiff was extricated from the car with a reported loss of consciousness. (R. 424). At the hospital, he complained of a vague headache and generalized neck pain, along with right shoulder, elbow, forearm, hand, and wrist pain. (R. 424). On physical examination, he had generalized discomfort in the lumbosacral area, small swelling on the lateral aspect of the distal left radius, and tenderness over the right AC joint without step-off. (R. 425). He was diagnosed with neck sprain/whiplash and right wrist sprain and was prescribed pain medication. (R. 427).

On March 17, 2017, Plaintiff was seen by Physician's Assistant ("PA") Bradley Rice for a follow-up appointment; he was noted to have diagnoses of concussion and injury of the right upper extremity. (R. 437). On examination, Plaintiff had obvious discomfort with flexion and extension of the wrist and palpable spasm over the radial aspect of the mid forearm musculature or muscle tension. (R. 440). PA Rice opined that Plaintiff likely had muscle contusion and spasm of the affected arm and was experiencing symptoms of post-concussive syndrome. (R. 441). The next day, March 18th, Plaintiff went to the Emergency Department of the Albany Medical Center with concerns of a possible subarachnoid hemorrhage. (R. 448). He reported a persistent headache that was different from his usual headaches. (R. 448–49). He was evaluated by neurosurgery, underwent a CT scan, and was deemed safe for discharge. (R. 452).

On March 21, 2017, Plaintiff saw Dr. Eric Goe and reported a worsening headache since his accident. (R. 466). He was assessed with head injury with a subarachnoid hemorrhage and a concussion. (R. 467). He saw Dr. Goe again on April 4th, complaining of "unrelenting pain in [his] right forearm," neck and back pain that was improving but still painful, and that his lightheadedness and headaches had improved. (R. 469). On examination, Plaintiff had tenderness to palpation of the right forearm and trapezius. (R. 470). Dr. Goe's assessment included concussion which is resolving and "pain in forearm which is failing to change as expected." (R. 470).

On June 5, 2017, Plaintiff saw Dr. Goe again, complaining of neck discomfort with radiation into his arms; Dr. Goe noted that a recent EMG/nerve conductions study demonstrated right carpal tunnel syndrome. (R. 471). On June 29, 2017, Plaintiff saw Dr. Shawn Jorgensen, who noted that the test showed primarily ulnar neuropathy at the elbow and less significant neuropathy at the wrist. (R. 477). Plaintiff complained of shooting pain going down his arms

4

when he extended his neck. (R. 478). On examination, he had borderline hyperreflexia and positive Hoffman's response on the right; Dr. Jorgensen opined that cervical myelopathy was possible. (R. 478).

Plaintiff complained of migraines, or left-sided cluster headaches, throughout the relevant time period. (R. 948–51, 961, 969, 973, 985, 988, 997, 1010, 1033, 1035, 1027, 1024). On November 9, 2017, Plaintiff went to the Emergency Department reporting that he had daily headaches that were only relieved with Sumatriptan. (R. 951). He returned to the Emergency Department on five occasions due to migraine headaches. (*See* R. 961, 969, 985, 997, 1010). He reported problems running out of Sumatriptan because his health insurance did not pay for enough medication to resolve his frequent headaches. (R. 948, 969, 973, 985, 997, 1010, 1033). In treatment with Dr. Ayesha Butt, he was diagnosed with "chronic cluster headache, intractable." (R. 1035). He reported that his pain was located mostly in the back of his neck, occasionally radiating to his shoulder, along with intermittent numbness in both arms and hands. (R. 1027).

During this time, Plaintiff also received treatment from PA James Todt; Plaintiff reported wrist and arm pain and PA Todt made findings of tenderness of the arm, positive Tine's sign at the wrist, and decreased or painful muscle strength against resistance. (R. 520, 525, 533–45, 616–17, 620). Plaintiff attended physical therapy sessions throughout March and April of 2017. (R. 777–78). He attended occupational therapy sessions and received chiropractic treatment. (R. 624–30, 787–96).

Plaintiff also treated with Dr. Rodrigo Castro at Sherban Orthopedics & Spine Surgery for ongoing complaints of back pain that extended into his upper extremities. (R. 661). On examinations in September and November 2017 and January 2018, Dr. Castro noted that

Plaintiff stood with a slightly forward flexed posture and had: moderate tenderness over the cervical spine; decreased range of motion of the cervical spine due to pain; pain radiating down both arms; and definitive bilateral trapezius muscle spasm. (R. 649, 654, 659). Dr. Castro diagnosed Plaintiff with "cervical spine pain with bilateral upper extremity and myalgias;" prescribed him medication for pain, inflammation, and muscle spasm; and performed a trigger point injection. (R. 650, 655–56, 660).

### 2. Imaging Studies

On March 13, 2017, X-rays of Plaintiff's lumbar spine showed mild anterior wedging of T11 and T12, likely chronic in nature. (R. 434). On March 17, 2017, an X-ray of Plaintiff's wrist showed no fracture or dislocation, and a CT scan of his head showed a "mild questionable subarachnoid bleed." (R. 440–41). On April 4th and 7th, an X-ray and an MRI of his right forearm were normal. (R. 715, 717). On May 9, 2017, an EMG/nerve conduction study returned abnormal findings, including mild right median neuropathy at the wrist consistent with carpal tunnel syndrome. (R. 484). On June 6, 2017, an X-ray of the cervical spine showed "no acute pathology or explanation for the patient's symptoms." (R. 716).

On June 29, 2017, an EMG/nerve conduction study showed an "ulnar neuropathy at the elbow and a less significant one at the wrist." (R. 720). On July 15, 2017, an MRI of the cervical spine showed multilevel degenerative changes with no significant central canal or foraminal stenosis, but moderate left foraminal stenosis at C3-4 and C4-5 and small disc protrusions at C4-5, C5-6 and C6-7. (R. 666). On August 10, 2017, an X-ray of the cervical spine showed mild end plate spurring involving mid and lower cervical spine levels and slight disc space narrowing at C5-6. (R. 797). X-rays of the cervical spine on the same date showed minimal end plate spurring and slight disc space narrowing at multiple levels of the mid thoracic

spine and minimal dextroscoliosis of the lower thoracic spine. (R. 799). On October 3, 2019, an EMG/nerve conduction study returned mostly normal results. (R. 1045).

### 3. Opinion Evidence

On October 24, 2017, Plaintiff was seen by Dr. Russell Lee for an internal medicine examination. (R. 637). Plaintiff reported being in a motor vehicle accident in March, and that he had constant neck pain which radiated down to his extremities. (R. 637). Plaintiff also reported left elbow pain since the accident, forearm pain, and carpal tunnel syndrome. (R. 637). He stated that he had experienced cluster headaches since childhood, which were relieved by taking Sumatriptan. (R. 637). Plaintiff said that he had two to three headaches per day, which caused "throbbing, piercing" pain rated 10 out of 10. (R. 637). On examination, Dr. Lee noted that Plaintiff had limited wrist range of motion in dorsiflexion at 50 degrees on the right and 60 degrees on the left. (R. 639). Dr. Lee opined that Plaintiff had "mild to moderate limitations for activities involving carrying heavy objects and mild to moderate limitations for handling objects," and "moderate limitations for activities involving reaching." (R. 640). An X-ray performed in conjunction with the exam showed mild degenerative changes of the cervical spine. (R. 641).

On November 2, 2017, Dr. A. Auerbach, a medical consultant, reviewed Plaintiff's records and noted that "there was no evidence of cervical radiculopathy or brachial plexopathy." (R. 195). Dr. Auerbach also noted that despite Plaintiff's complaints of pain, "on physical exam there was full range of motion of the cervical spine and mild dorsi flexion at the wrists bilaterally." (R. 195). Dr. Auerbach observed that Plaintiff reported a history of cluster headaches since childhood that responded to medication, but that there was no medical source

7

evidence addressing this allegation. (R. 195). Dr. Auerbach opined that Plaintiff was limited to light work. (R. 196).

On November 29, 2017, Dr. Ross Sherban, an Orthopedic Spinal Surgeon who worked with Dr. Castro, completed a treating source statement for Plaintiff. (R. 645–46). Dr. Sherban listed Plaintiff's medical conditions as: cervical disc displacement at C6-7 and C4-5, radiculopathy in the cervical region, and myalgia. (R. 645). He noted that Plaintiff could possibly improve with chiropractic treatment and medication. (R. 645). He opined that Plaintiff was 100% temporarily totally disabled. (R. 646).

On August 15, 2019, Dr. Sherban completed a lumbar and cervical spine residual functional capacity questionnaire. (R. 803–07). He noted that Plaintiff suffered from cervical spine pain with bilateral upper extremity radiculopathy, with symptoms including tenderness, crepitus, muscle spasm, muscle weakness, chronic fatigue, sensory changes, impaired sleep, atrophy, motor loss, dropping things, and reduced grip strength. (R. 803). He found that Plaintiff had severe headaches, with symptoms including nausea/vomiting, malaise, photosensitivity, inability to concentrate, impaired sleep, exhaustion, mood changes, mental confusion, and impaired appetite. (R. 804). Plaintiff's headaches were alleviated by taking medication, laying down, and retreating to a quiet, dark place. (R. 804).

Dr. Sherban opined that Plaintiff's experience of pain and other symptoms was constantly severe enough to interfere with the attention and concentration needed to perform even simple work tasks, and that Plaintiff was incapable of even low stress jobs. (R. 805). He opined that Plaintiff would need daily unscheduled breaks, for 30–60 minutes each, in which he would need to lay down. (R. 806). In addition, Dr. Sherban found that Plaintiff could: rarely lift 10 pounds or less and never lift more than that; rarely turn his head right or left and look up; and

never look down (sustained flexion of the neck) or hold his head in a static position. (R. 806). He opined that Plaintiff had significant limitations in reaching, handling, and fingering, and that Plaintiff would be absent from work more than four days per month. (R. 807). Dr. Sherban noted that Plaintiff had suffered from these symptoms and limitations for two and a half years. (R. 807).

### C. ALJ's Decision Denying Benefits

At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful employment since March 13, 2017, the alleged onset date of disability. (R. 18). At step two, the ALJ determined that Plaintiff had the following "severe" impairments: 1) carpal tunnel syndrome; 2) degenerative disc disease in the cervical spine with radiculopathy; and 3) migraine headaches (20 C.F.R. §§ 404.1520(c) and 416.920(c)). (R. 18).

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926)." (R. 19).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following additional limitations:

> Claimant can never climb ladders, ropes, or scaffolds; claimant can occasionally stoop and crouch, but never kneel or crawl; claimant can occasionally reach, finger, and handle; claimant must avoid unprotected heights; and claimant must avoid using heavy machinery, including motor vehicles for work purposes.

(R. 19).

Next, the ALJ found that Plaintiff was unable to perform any of his past relevant work as a Warehouse Worker and Management Trainee. (R. 25). The ALJ then asked a vocational expert whether "jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." (R. 26). The vocational expert responded that such jobs included Dealer Accounts Investigator, Counter Clerk, and Furniture Rental Clerk. (R. 26). Based on this testimony, the ALJ concluded that considering Plaintiff's age, education, work experience, and RFC, he was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 26). Consequently, the ALJ found that Plaintiff was not disabled. (R. 27).

### III. STANDARD OF REVIEW

#### A. Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that [he] is not only unable to do his previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Social Security Administration uses a five-step process to evaluate disability claims:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical

10

> evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the initial burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation omitted).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (citation omitted). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is affected by legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).

11

### C. Evaluating Medical Opinions

For claims filed after March 27, 2017, as is the case here, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules")*, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017); *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c). The ALJ is still required to "articulate how [he] considered the medical opinions" and "how persuasive [he] find[s] all of the medical opinions." *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," and an ALJ is required to "explain how [he] considered the supportability and consistency factors" for a medical opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2).

## IV. DISCUSSION

Plaintiff challenges the ALJ's decision to deny him SSD and SSI benefits on the grounds that: 1) "[t]he ALJ did not properly consider the effect of Plaintiff's migraine headaches on his ability to do work, and he mischaracterized the evidence in finding that medication resolved Plaintiff's migraines where the record shows ongoing issues with migraines due to insurance coverage problems;" and 2) "[t]he ALJ erred in relying on the stale opinions from the state agency consultants, where Plaintiff's treating physician provided a much more current statement that addressed Plaintiff's cervical spinal issues which had

12

worsened since Plaintiff underwent his consulting exam." (Dkt. No. 17-1, p. 1). The Court will address each argument in turn.

### A. Migraine Headaches

First, Plaintiff contends that the RFC formulated by the ALJ failed to account for Plaintiff's migraine headaches, which were a continuing problem because Plaintiff could not get sufficient medication to alleviate them. (Dkt. No. 17-1, pp. 9–10). In response, the Commissioner asserts that "substantial evidence supports the ALJ's consideration of Plaintiff's subjective complaints, including the alleged frequency of his migraine headaches." (Dkt. No. 18, p. 6).

At step two of his analysis, the ALJ found that Plaintiff's migraine headaches constituted a severe impairment. (R. 18). But the migraine headaches are barely mentioned in the rest of the decision. The ALJ noted that "[w]hile claimant apparently experiences several headaches per day, Dr. Lee indicated that he reported that those headaches were 'relieved by taking [Sumatriptan].'" (R. 23). The ALJ also noted that Dr. Ayesha Z. Butt prescribed Sumatriptan for Plaintiff's headaches and advised him to establish care with a neurologist. (R. 23). There are no records from a neurologist, which would have been particularly helpful to assess any limitations related to Plaintiff's headaches, such as time off-task and difficulty concentrating due to pain and light sensitivity. The Commissioner contends that the ALJ included headache-related limitations, but the RFC appears to contain only physical limitations, i.e., for reaching, handling, etc.[2] Thus, the only reasonable conclusion is that the ALJ found that Plaintiff's headaches were effectively controlled with Sumatriptan.

---

[2] Although the ALJ included limitations for avoiding unprotected heights and using heavy machinery, it is not clear how these limitations relate specifically to headaches.

13

This finding is not supported by substantial evidence. According to the Regulations, the ALJ may evaluate symptoms by considering the "type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(iv). The ALJ correctly noted that Sumatriptan was effective in treating Plaintiff's migraine headaches. But the record shows that Plaintiff often did not have the ability to obtain enough Sumatriptan (due to more frequent headaches and issues with health insurance), which led to several trips to the Emergency Department. (*See* R. 457, 948, 969, 973, 985, 997, 1010, 1033). This is consistent with Plaintiff's testimony that his headaches had increased in frequency and that his health insurance did not pay for enough Sumatriptan to alleviate them. (R. 142). The ALJ did not address this issue at the hearing or in the final decision, and therefore, his evaluation of Plaintiff's symptoms is incomplete.[3]

The Commissioner contends that Plaintiff has not shown how the headaches "would cause him to be off-task and render him incapable of performing work consistent with the ALJ's RFC." (Dkt. No. 18, p. 8). But Dr. Sherban observed that Plaintiff's headaches caused nausea and vomiting, malaise, photosensitivity, inability to concentrate, impaired sleep, exhaustion, mood changes, and mental confusion. (R. 804). These symptoms, left untreated, would undeniably cause Plaintiff a number of problems in performing any job. *See also* Soc. Sec. Rul., SSR 19-4p; Titles II and Xvi: Evaluating Cases Involving Primary Headache Disorders, SSR 19-4P (Aug. 26, 2019) (describing limitations caused by headache disorders). Because Plaintiff's RFC assumed that his migraine headache symptoms were completely alleviated by Sumatriptan,

---

[3] Relatedly, SSR 16-3P states that, in considering a claimant's treatment history, an ALJ may consider that the claimant "may not be able to afford treatment and may not have access to free or low-cost medical services." Soc. Sec. Rul. 16-3p Titles II and Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P (Oct. 25, 2017).

without any discussion or findings about his *access* to the medication, it is not supported by substantial evidence.[4]

### B. Opinion Evidence

Next, Plaintiff argues that the ALJ erred in his assessment of the opinion evidence. (Dkt. No. 17-1, p. 12). Specifically, Plaintiff contends that the ALJ should not have relied so heavily on the "stale" opinions of Drs. Lee and Auerbach, while discounting the more recent opinion of Plaintiff's treating physician Dr. Sherban. (*Id.*). In response, the Commissioner argues that "the ALJ properly relied on Drs. Lee and Dr. Auerbach in assessing Plaintiff's functional limitations and supportably discounted Dr. Sherban's opinion." (Dkt. No. 18, p. 18).

The record shows that Plaintiff saw Dr. Lee for an internal medicine examination on October 24, 2017. (R. 637). Dr. Lee found that Plaintiff had only mild to moderate physical limitations. (R. 637). The ALJ found this opinion to be persuasive because his findings were consistent with his clinical findings and other medical evidence. (R. 24). On November 2, 2017, Dr. Auerbach reviewed Plaintiff's file and determined that he was limited to light work. (R. 196). The ALJ found this opinion persuasive because Dr. Auerbach's findings were "consistent with medical evidence concerning claimant's physical impairments since the alleged onset date." (R. 24). More than 21 months later, on August 15, 2019, Dr. Sherban provided an assessment for Plaintiff indicating much more severe limitations. (R. 803–07). The ALJ found Dr. Sherban's opinion was not persuasive because: 1) he never examined Plaintiff; 2) his findings were not consistent with those of Drs. Lee and Auerbach; and 3) his assessment was not consistent with Plaintiff's tests and treatment records. (R. 24–25).

---

[4] *See also Johnson v. Commr. of Soc. Sec.*, 13-CV-217, 2014 WL 2118444, at *5, 2014 U.S. Dist. LEXIS 69598, at *17 (D. Vt. May 21, 2014) (finding that the ALJ's RFC limiting the plaintiff to light work did not account for the plaintiff's migraine headaches).

In general, an ALJ should not rely on medical source opinions that are "conclusory, stale, and based on an incomplete medical record." *Fambo v. Commr. of Soc. Sec.*, 474 F. Supp. 3d 603, 608 (W.D.N.Y. 2020). However, even a more dated opinion may constitute substantial evidence "if it is consistent with the record as a whole notwithstanding its age." *Id.* Here, Plaintiff contends that the opinions of Drs. Lee and Auerbach are stale and based on an incomplete record because his condition deteriorated after the opinions were written in 2017. Specifically, Plaintiff claims that his cervical spinal condition and migraine headaches worsened in late 2017 and 2018. (Dkt. No. 17-1, p. 13).

The record shows that Plaintiff established care with Dr. Castro, an orthopedic spine surgeon, on or about November 16, 2017. (R. 653). Over the course of multiple exams, Dr. Castro found decreased range of motion in Plaintiff's cervical spine secondary to pain, and he diagnosed "cervical spine pain with bilateral upper extremity and myalgias." (R. 648-61). Dr. Castro prescribed Plaintiff medication and performed a trigger point injection. (R. 660, 655–56). Notably, these treatment records post-date the opinions of Drs. Lee and Auerbach, who also did not consider a July 15, 2017 MRI which showed degenerative changes in the cervical spine and several disc protrusions. (R. 666). Further, Drs. Lee and Auerbach did not have the opportunity to consider records from late 2017 and 2018 indicating that Plaintiff's migraine headaches had increased in frequency, which led to several trips to the Emergency Department when he ran out of medication. (R. 951, 961, 969, 985, 997, 1010).

While the Court cannot say with certainty whether the above records would have changed the opinions of Drs. Lee and Auerbach, it is clear that they did not have a complete picture of Plaintiff's condition. Accordingly, their opinions did not constitute substantial

16

evidence for the ALJ's decision.[5] *See Rymer v. Colvin*, 62 F. Supp. 3d 265, 274 (W.D.N.Y. 2014) (finding that opinions of consultative examiner and non-examining consultant did not constitute substantial evidence to support the ALJ's decision, where "approximately half of the record was submitted after their opinions were issued").

### C. Remedy

In general, remand is appropriate for Social Security claims when further findings and development of the record would help to assure proper disposition of the claims. *See Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999). As discussed above, the ALJ's finding that Plaintiff's migraine headaches were well-controlled was not supported by substantial evidence. Remand is necessary for the ALJ to making specific findings as to Plaintiff's access to Sumatriptan and how his migraine headaches affected his ability to work. For the latter issue, the ALJ may wish to request a neurological consultative examination pursuant to 20 C.F.R. § 404.1517. Remand is also necessary for Drs. Lee and Auerbach to evaluate Plaintiff's condition and limitations based on his updated medical records. The ALJ may then reassess their opinions and Plaintiff's RFC. In doing so, it would be prudent to request a medical source statement from Plaintiff's treating physician Dr. Castro, who, unlike Dr. Sherban, personally examined Plaintiff and was in an ideal position to opine on his condition and limitations.

### V. CONCLUSION

For these reasons, it is

---

[5] The Court declines to address Plaintiff's argument that more persuasiveness should have been afforded to the opinion of Dr. Sherban, inasmuch as the ALJ's related analysis was driven in part by his reliance on the incomplete opinions of Drs. Lee and Auerbach. (R. 24–25).

**ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:   November 17, 2021
          Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge